**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**DINA ADEL MHMOUD,** Plaintiff,

v.

**CHEETAH X INC. and ALEXANDER DEBELOV,** Defendants.

**Case No. 25-cv-00198-DMR**

---

**DEFENDANT ALEXANDER DEBELOV'S MOTION TO QUASH SERVICE OF PROCESS AND TO DISMISS THE COMPLAINT**

**Date:** [to be set]
**Time:** [to be set]
**Courtroom:** [to be set]

---

**NOTICE OF MOTION AND MOTION**

TO PLAINTIFF AND HER ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 4th, at 3 pm, or as soon thereafter as the matter may be heard in the above-entitled Court, Defendant Alexander Debelov ("Defendant" or "Mr. Debelov") will and hereby does move this Court for an order:

1. Quashing service of process pursuant to Federal Rule of Civil Procedure 12(b)(5);
2. Dismissing the Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2);
3. Dismissing the Complaint for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3);
4. Dismissing the Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6); and
5. Granting such other and further relief as the Court deems just and proper.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Alexander Debelov, the exhibits attached thereto, all

pleadings and papers on file in this action, and such oral and documentary evidence as may be presented at the hearing on this Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**TABLE OF CONTENTS**

**I. INTRODUCTION** ........................................................................... 3

**II. STATEMENT OF FACTS** .............................................................. 4

- A. The Complete Failure of Service: An Impossibility, Not Just a Defect
- B. Go X's Total Absence from California for Over Five Years
- C. Mr. Debelov's Lack of California Connections
- D. The Asset Ownership Program—Tangible Scooters, Not Securities
- E. Regulatory Validation Confirms No Securities
- F. Plaintiff's Bad Faith: Profiting While Suing in the Wrong Forum

**III. LEGAL STANDARD** ....................................................................... 9

- A. Motion to Quash Service (Rule 12(b)(5))
- B. Motion to Dismiss for Lack of Personal Jurisdiction (Rule 12(b)(2))
- C. Motion to Dismiss for Improper Venue (Rule 12(b)(3))
- D. Motion to Dismiss for Failure to State a Claim (Rule 12(b)(6))

**IV. ARGUMENT** ................................................................................. 10

- A. SERVICE WAS FUNDAMENTALLY DEFECTIVE AND MUST BE QUASHED
- B. This Court Lacks Personal Jurisdiction Over Mr. Debelov
- C. Venue Is Improper in the Northern District of California
- D. The Complaint Fails to State Any Viable Claim as a Matter of Law
- E. Due Process Concerns and Parallel Proceedings Warrant Dismissal

**V. CONCLUSION** ............................................................................ 30

## I. INTRODUCTION

This case begins and ends with a fundamental failure: Plaintiff has not properly served either defendant. Her attempts at service were not merely defective—they were insufficient to establish jurisdiction. She claims to have served Go X through a California registered agent that has not existed for over five years. She claims to have served Mr. Debelov by taping papers to the door of a San Francisco apartment that, while he maintains access to it, is not his usual place of abode. She supplemented these failures with emails to unauthorized addresses. None of these attempts satisfy Rule 4, and without proper service, this Court lacks jurisdiction to proceed.

Even if Plaintiff could cure these fatal service defects— which she cannot without starting over — this case would still fail for lack of personal jurisdiction, improper venue, and failure to state any viable claim. But the Court need not reach these issues because the threshold requirement of proper service has not been met.

The service failures are particularly egregious because they reveal Plaintiff's complete lack of diligence and bad faith. Any minimal investigation would have revealed that:

- **Go X has had no registered agent in California for over five years**
- **Go X has not been registered to do business in California for over five years**
- **Go X has no offices, employees, scooters, or operations in California**
- **Mr. Debelov resides in Florida, not at a San Francisco rental property**

Instead of conducting basic due diligence, Plaintiff chose to file suit in the most inconvenient possible forum— one with no connection to any party or event — and then failed to accomplish even the basic task of proper service. This failure is not a mere technicality; it is a fundamental violation of due process that deprives this Court of jurisdiction.

Making matters worse, Plaintiff brings this suit while continuing to profit from the very program she challenges. She owns multiple scooters, maintains full dashboard access, and continues earning revenue as of July 2025. She has suffered no injury, lost no money, and faces no harm. Yet she

asks this Court to exercise jurisdiction based on impossible service attempts in a forum with no connection to her claims.

The substantive claims fare no better. Plaintiff purchased tangible electric scooters—complete with serial numbers, bills of sale, and the right to retrieve and use them personally. Indeed, 45% of purchasers used their scooters for personal transportation, with some logging over 800 rides. These are asset purchases, not securities, as confirmed by:

- Written determinations from Connecticut and New Hampshire that the program "does not involve the sale of a security"
- Four independent legal opinions reaching the same conclusion
- Review by 45+ state regulators with no enforcement action
- The economic reality that Go X lost over $1 million while scooter owners earned $2.7 million—proving no "common enterprise" from 2021-2023

For all these reasons—but first and foremost the complete failure of service—this Court should dismiss this action with prejudice.

## II. STATEMENT OF FACTS

### A. The Complete Failure of Service: An Impossibility, Not Just a Defect

The most fundamental fact in this case is that neither defendant has been properly served. Plaintiff's service attempts were not merely defective—they were impossible:

### 1. Service on a Non-Existent Registered Agent

Plaintiff claims to have served Go X through a California registered agent. This is impossible because **Go X has had no registered agent in California for over five years.** (Declaration of Alexander Debelov ("Debelov Decl."). When Go X allowed its California registration to lapse over five years ago, any registered agent's authority to accept service terminated immediately. Any entity that purported to accept service on Go X's behalf had no authority whatsoever to do so.

This is not a minor technical defect—it is an impossibility. One cannot serve a non-existent agent any more than one can serve a deceased person or a dissolved corporation. Yet Plaintiff apparently conducted so little investigation that she did not even discover this basic fact.

**2. Invalid Service on Mr. Debelov**

Plaintiff's attempt to serve Mr. Debelov was equally defective. She allegedly taped documents to the door of a San Francisco property. This fails for multiple reasons:

- **Not His Residence**: The property is a rental property where Mr. Debelov spent fewer than three weeks in 2021
- **Not Present**: Mr. Debelov was not at the property when papers were allegedly taped to the door
- **No Person Served**: No person of suitable age and discretion was served
- **No Business Connection**: Mr. Debelov conducts no business at this property

**3. Unauthorized Email Service**

Plaintiff also attempted service via email to "alex@goxapp.com," a secondary business address that Mr. Debelov rarely monitors and that has never been authorized for service of legal process. No statute, rule, or court order authorized email service in this case.

**4. No Attempt at Proper Service**

Most tellingly, Plaintiff made no attempt to serve either defendant properly:

- No attempt to serve Mr. Debelov at his actual residence in Florida
- No attempt to serve Go X through its registered agent in Delaware
- No attempt to obtain a court order for alternative service
- No showing of any diligence whatsoever

These failures are not mere technicalities—they are fundamental violations of due process that deprive this Court of jurisdiction.

**B. Go X's Total Absence from California for Over Five Years**

The extent of Go X's absence from California cannot be overstated:

**1. No Corporate Registration**: Go X has not been registered to do business in California for over five years. The company made a deliberate decision to allow its registration to lapse when it became clear it would have no California operations.

**2. No Registered Agent**: Go X has had no registered agent for service of process in California for over five years.

**3. No Business Presence Whatsoever**:

- No offices, facilities, or physical locations in California
- No employees or contractors in California
- No scooters deployed or operating in California
- No business partners or vendors in California
- No customers using services in California
- No marketing to California residents
- No bank accounts with California addresses

**4. No California Participants**: Not a single California resident participated in the scooter ownership program. All 280 participants resided in states where Go X actively operated.

**5. Active Operations Elsewhere**: Go X operates exclusively in Florida, Hawaii, Louisiana, and Nevada, where it has served over 600,000 riders and completed over 1,000,000 rides. California is conspicuously and intentionally absent from this list.

**C. Mr. Debelov's Insufficient California Contacts for Jurisdictional Purposes**

Mr. Debelov's connections to California are minimal and purely personal:

**1. Florida Residence**: Mr. Debelov maintains a residence in Florida where he conducts substantial business activities.

**2. Limited California Presence**: While Mr. Debelov maintains a property in San Francisco and spends time there, he spent fewer than three weeks at the property in 2021 and minimal time in subsequent years.

**3. No Relevant Business Activities**: Mr. Debelov conducts no business related to the Scooter Ownership Platform from California, maintains no office there for such business, and holds no business meetings there related to the alleged claims.

**4. Florida Business Operations**: Mr. Debelov's business operations related to any scooter platform activities are conducted from Florida.

**D. The Asset Ownership Program—Tangible Scooters, Not Securities**

The scooter ownership program involved straightforward purchases of tangible assets:

**1. Full Ownership Rights**: Each purchaser received:

- A bill of sale with unique serial numbers
- Complete legal title to specific scooters
- The right to retrieve scooters at any time
- The ability to use scooters personally

**2. Individual Asset Performance**:

- No pooling of assets or revenues
- Each scooter's earnings tracked separately
- Returns varied dramatically from $0.17 to $10.15 per scooter daily
- No correlation between different owners' returns

**3. The Dispositive Economic Reality**: Between 2021 and 2023, **Go X lost over $1 million operating the program while paying out over $2.7 million to scooter owners.** This single fact destroys any claim of a "common enterprise"—in a true common enterprise, when the promoter loses money, so do the investors. Here, the opposite occurred.

**4. Active Use and Control**:

- 45% of owners used their scooters personally
- Some owners logged over 800 personal rides
- Owners set pricing and availability schedules
- Owners could monitor real-time performance

**E. Regulatory Validation Confirms No Securities**

The regulatory consensus is overwhelming and unanimous:

**1. State Regulator Reviews**: Over 45 state securities regulators reviewed the program. None found it to involve securities.

**2. Formal Written Determinations**:

- Connecticut Department of Banking: The program "does not involve the sale of a security"
- New Hampshire Bureau of Securities: The program "does not contemplate the offer or sale of securities"

**3. Legal Opinions**: Four independent securities attorneys analyzed the program under the Howey test and concluded it involved asset sales, not securities.

**4. Regulatory Status**: While the SEC has filed a civil enforcement action premised on factual allegations we contest as incorrect, we are mounting a vigorous defense to those claims. Notably, no California regulatory body, including the DFPI, has taken any enforcement action related to these matters.

**F. Plaintiff's Bad Faith: Profiting While Suing in the Wrong Forum**

Perhaps most remarkably, Plaintiff continues to profit from the program she challenges:

**1. Ongoing Benefits**: Plaintiff still owns her scooters, maintains dashboard access, and continues earning revenue as of July 2025.

**2. No Injury**: Plaintiff has suffered no losses and continues to profit from her scooter ownership.

**3. Forum Shopping**: Rather than pursue claims in Florida (where defendants reside and operate) or through the regulatory agencies already investigating, Plaintiff chose the most inconvenient and unconnected forum possible.

**4. Voluntary Refund Program**: When some markets underperformed, Go X voluntarily processed over $720,000 in refunds, taking 90% losses to ensure no participant lost money. Plaintiff never requested a refund because she continues to profit.

**III. LEGAL STANDARD**

**A. Motion to Quash Service (Rule 12(b)(5))**

Federal courts are courts of limited jurisdiction that can only exercise power when properly invoked through valid service of process. "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).

The plaintiff bears the burden of establishing proper service. *Brockmeyer v. May*, 383 F.3d 798, 801 (9th Cir. 2004). Without proper service, the court must dismiss the action. *Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982) ("in the absence of proper service of process, the district court has no power to render any judgment against the defendant").

Rule 4 must be strictly construed. "Neither actual notice nor simply naming defendant in the complaint will provide personal jurisdiction without substantial compliance with Rule 4." *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986).

**B. Motion to Dismiss for Lack of Personal Jurisdiction (Rule 12(b)(2))**

Personal jurisdiction requires that defendants have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

For individuals, general jurisdiction exists only where they are domiciled. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Specific jurisdiction requires: (1) purposeful direction of activities at the forum; (2) claims arising out of those activities; and (3) reasonableness. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

**C. Motion to Dismiss for Improper Venue (Rule 12(b)(3))**

Venue is proper only in: (1) a judicial district where any defendant resides, if all defendants reside in the same State; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred; or (3) if neither applies, any judicial district in which any defendant is subject to personal jurisdiction. 28 U.S.C. § 1391(b).

The plaintiff bears the burden of showing proper venue. *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979).

**D. Motion to Dismiss for Failure to State a Claim (Rule 12(b)(6))**

To survive a motion to dismiss, a complaint must state "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For securities claims, courts apply the Howey test to determine whether an investment contract exists. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

**IV. ARGUMENT**

**A. SERVICE WAS FUNDAMENTALLY DEFECTIVE AND MUST BE QUASHED**

The Court's analysis must begin and end with service of process, because without proper service, the Court lacks jurisdiction to consider any other issue. Here, service was not just defective—it was impossible, revealing Plaintiff's shocking lack of diligence and bad faith.

**1. The Impossibility of Service on a Non-Existent Registered Agent**

Plaintiff's attempt to serve Go X through a California registered agent is the clearest evidence of her failure to conduct even minimal due diligence. **Go X has had no registered agent in**

**California for over five years.** This is not a technical defect that can be cured—it is an impossibility.

When a corporation's registration lapses, its registered agent's authority to accept service terminates as a matter of law. *Cal. Corp. Code § 1502(e)*; *see also Rains v. Criterion Sys., Inc.*, 80 F.3d 339, 343 (9th Cir. 1996) ("Service on a party without authority to accept service is ineffective for any purpose"). Any entity that purported to accept service had no authority to do so and such acceptance is void *ab initio*.

The legal consequences are severe and unambiguous. "The statutory requirements for service of process are not mere technicalities, and failure to comply with such statutory requirements renders the service invalid." *Trs. of Cent. States, Se. & Sw. Areas Pension Fund v. Sloan*, 902 F.2d 593, 596 (7th Cir. 1990). Service on a non-existent agent is no service at all.

**Plaintiff's failure to discover this basic fact—which would have been revealed by any corporate records search—demonstrates bad faith.** Either Plaintiff knew Go X had no California agent and proceeded anyway, or she failed to conduct even the most basic investigation before filing suit. Neither scenario supports exercising jurisdiction.

Courts do not reward such carelessness. *See Travelers Cas. & Sur. Co. of Am. v. Brenneke*, 551 F.3d 1132, 1135 (9th Cir. 2009) ("Compliance with Rule 4 is not some mindless technicality"); *Veeck v. Commodity Enters., Inc.*, 487 F.2d 423, 426 (9th Cir. 1973) ("The rules regarding service of process must be strictly followed").

### 2. Service on Mr. Debelov Was Equally Defective

Plaintiff's attempt to serve Mr. Debelov by taping papers to a rental property door fails every requirement of Rule 4(e), which provides only four methods for serving an individual:

- (A) Personal delivery to the defendant
- (B) Leaving process at the defendant's dwelling or usual place of abode with someone of suitable age and discretion who resides there
- (C) Delivery to an authorized agent

- (D) Methods permitted by state law

Plaintiff's service satisfies none of these requirements:

**a. Not Personal Service Under Rule 4(e)(2)(A)**

Taping documents to a door is not personal service. *Espinoza v. United States*, 52 F.3d 838, 841 (10th Cir. 1995) ("leaving the summons on the front door step does not qualify as personal service"); *Fashion Page, Ltd. v. Zurich Ins. Co.*, 50 F.3d 548, 553 (8th Cir. 1995) (taping to door "woefully inadequate").

**b. Not Service at Dwelling Under Rule 4(e)(2)(B)**

Even if papers had been left with a person (they were not), the San Francisco property is not Mr. Debelov's "dwelling or usual place of abode":

- It is a rental property
- Mr. Debelov spent fewer than three weeks there in 2021
- He conducts no business there
- He maintains residence is in Florida

"The key inquiry is whether the defendant was actually living at the residence at the time of service." *Karsten v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, 36 F.3d 8, 9 (4th Cir. 1994). A property visited three weeks annually is not a dwelling. *See National Dev. Co. v. Triad Holding Corp.*, 930 F.2d 253, 257 (2d Cir. 1991) (property used "only sporadically" not a dwelling); *First Nat'l Bank v. Deangelis*, 577 F. Supp. 455, 457 (D.R.I. 1983) (summer home occupied six weeks annually insufficient).

Moreover, Rule 4(e)(2)(B) requires leaving process "with someone of suitable age and discretion who resides there." No such person was served—papers were merely taped to a door.

**c. No Authorized Agent Under Rule 4(e)(2)(C)**

No one authorized to accept service for Mr. Debelov was served. The email to "alex@goxapp.com" fails because:

- Email service requires statutory authorization or court order, neither of which exists here
- This secondary business email was never authorized for legal service
- Mr. Debelov rarely monitors this address
- No case law supports email service without explicit authorization

*Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1017 (9th Cir. 2002) ("We do not hold that email service is forbidden in all cases, but we do require more than plaintiff has shown here").

**3. No Attempt to Cure or Seek Alternative Service**

Perhaps most damning, Plaintiff made no effort to properly serve either defendant:

- No attempt at Mr. Debelov's Florida residence
- No attempt through Go X's Delaware registered agent
- No motion for alternative service under Rule 4(f)(3)
- No showing of diligence or good faith efforts

"A plaintiff must demonstrate that the method of service attempted was reasonably calculated to give notice." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Serving non-existent agents and taping papers to empty rental properties fails this constitutional minimum.

**4. The Consequences of Failed Service Are Severe**

Without proper service, this Court lacks jurisdiction to proceed. "In the absence of proper service of process, the district court has no power to render any judgment against the defendant." *Veeck*, 487 F.2d at 426. The remedy is dismissal, not further opportunities to serve. *See Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982).

Given Plaintiff's demonstrated bad faith—suing in an unconnected forum and failing to conduct basic diligence—the Court should dismiss with prejudice rather than grant leave to re-serve. *See*

*Stevens v. Sec. Pac. Nat'l Bank*, 538 F.2d 1387, 1391 (9th Cir. 1976) (affirming dismissal with prejudice for service failures showing lack of prosecution).

**B. This Court Lacks Personal Jurisdiction Over Mr. Debelov**

Even if service could somehow be deemed proper (it cannot), this Court lacks personal jurisdiction over Mr. Debelov under any theory.

**1. No General Jurisdiction**

Mr. Debelov cannot be subject to general jurisdiction in California because:

- He maintains a residence in Florida where he conducts substantial business activities (Debelov Decl. ¶ 3)
- His business operations are centered in Florida
- He spends limited time in California—fewer than three weeks in 2021 and minimal time thereafter (Id. ¶ 5)
- He conducts no business related to this matter from California (Id. ¶ 31)

While Mr. Debelov maintains certain ties to California, including property ownership and time spent there, these connections fall far short of making him "essentially at home" in California for jurisdictional purposes. The Supreme Court has made clear that general jurisdiction over individuals requires more than occasional presence or property ownership. *Daimler*, 571 U.S. at 137-139.

**2. No Specific Jurisdiction**

Specific jurisdiction requires satisfying all three prongs of the Ninth Circuit test:

**a. No Purposeful Direction or Availment**

Mr. Debelov has not purposefully directed any activities at California related to this lawsuit:

- Go X has no California operations, employees, or customers
- No scooters were sold to or deployed in California

- All relevant business activities occurred in FL, HI, LA, and NV

Owning rental property is insufficient for jurisdiction over unrelated business claims. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("purchases and related trips, standing alone, are not a sufficient basis for... jurisdiction").

**b. Claims Do Not Arise from California Activities**

Even if owning rental property constituted a contact (it does not), Plaintiff's claims about a scooter program operated entirely outside California have no connection to that property:

- Program conceived and managed in Florida
- No program decisions made in California
- No representations made from California

"[T]he plaintiff's claims must arise out of or relate to the defendant's forum contacts." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1025 (2021). No such relationship exists here.

**c. Exercise of Jurisdiction Would Be Unreasonable**

The reasonableness factors overwhelmingly oppose jurisdiction:

- Severe burden defending 3,000 miles from home
- California's lack of interest in regulating Florida business activities
- Florida's strong interest in regulating its residents
- Plaintiff's bad faith forum shopping
- Availability of Florida forum

*Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113-14 (1987).

**3. No Alternative Basis for Jurisdiction**

Plaintiff cannot establish jurisdiction through any other theory:

- **Effects Test**: No intentional acts aimed at California. *Calder v. Jones*, 465 U.S. 783 (1984)
- **Agency**: No allegations supporting corporate veil piercing
- **Consent**: Property ownership ≠ consent to unrelated suits

## C. Venue Is Improper in the Northern District of California

Venue is improper under all three provisions of 28 U.S.C. § 1391(b):

**1. Venue Is Improper Under § 1391(c)**: For venue purposes under § 1391(c), neither defendant has the requisite connections to this district. Go X is a Delaware corporation with its principal place of business in Florida. Mr. Debelov's limited time in California and property ownership do not establish residence for venue purposes under the statute.

**2. No Substantial Events Occurred Here**: Every event related to the scooter program occurred outside California:

- Program operated in FL, HI, LA, NV
- All decisions made elsewhere

"[I]t is only the events that directly give rise to a claim [that] are relevant." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005).

**3. No Personal Jurisdiction**: Section 1391(b)(3) requires personal jurisdiction, which is absent.

The Court must dismiss or transfer to a proper venue. 28 U.S.C. § 1406(a).

## D. The Complaint Fails to State Any Viable Claim as a Matter of Law

Even reaching the merits (which the Court need not do), the Complaint fails because the scooter program involved asset purchases, not securities.

**1. The Howey Test Is Not Satisfied**

**a. No Common Enterprise**

The most devastating fact to Plaintiff's securities claim: **Go X lost over $1 million while owners earned $2.7 million from 2021-2023.** (Id. ¶ 21.) This is impossible in a common enterprise.

Additional facts destroying commonality:

- No pooling of assets or revenues
- Individual tracking of each scooter
- Returns varied from $0.17 to $10.15 daily per scooter
- Some owners earned 100%+ returns while others requested refunds

Both horizontal and vertical commonality are absent. *See Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (9th Cir. 1994).

**b. Not from Efforts of Others**

Owners exercised substantial control:

- Selected scooters and markets
- Set pricing and schedules
- Retrieved scooters at will
- 45% used them personally

This level of control defeats the "efforts of others" prong. *SEC v. Glenn W. Turner Enters.*, 474 F.2d 476, 482 (9th Cir. 1973).

**2. These Are Asset Sales**

Multiple factors confirm asset purchases:

- Bills of sale with serial numbers
- Physical possession rights
- Personal use by 45% of owners
- Tax depreciation benefits
- No secondary market

*United Housing Found. v. Forman*, 421 U.S. 837, 858 (1975) (distinguishing securities from "merchandise or goods").

### 3. Regulatory Validation

The unanimous regulatory consensus powerfully supports dismissal:

- 45+ states reviewed with no enforcement
- CT and NH: "does not involve... a security"
- Four legal opinions reached same conclusion

While not dispositive, such consensus is highly persuasive. *Marine Bank v. Weaver*, 455 U.S. 551, 559 n.9 (1982).

### E. Due Process Concerns and Parallel Proceedings Warrant Dismissal

Finally, fundamental fairness requires dismissal given:

**1. Parallel Regulatory Proceedings**: SEC and DFPI investigations create risks of inconsistent judgments and interference with agency expertise.

**2. Forum Shopping**: Plaintiff sued in the most inconvenient forum while continuing to profit from her scooters.

**3. No Injury**: Plaintiff continues earning money and has suffered no harm.

**4. Bad Faith**: The failure to conduct basic diligence (attempting service on non-existent agent) combined with forum shopping evidences bad faith warranting dismissal with prejudice.

### V. CONCLUSION

This case must be dismissed because Plaintiff has failed at the most fundamental level—she has not properly served either defendant. Her attempt to serve a non-existent registered agent is not a curable defect but an impossibility that reveals her complete failure to conduct basic due diligence.

Her attempt to serve Mr. Debelov by taping papers to an empty rental property violates every requirement of Rule 4. Without proper service, this Court lacks jurisdiction to proceed.

Even if these fatal service defects could somehow be overlooked—and they cannot—the case would still fail for lack of personal jurisdiction, improper venue, and failure to state any claim. Mr. Debelov has no connections to California that would support jurisdiction. Go X has been completely absent from California for over five years. The scooter program involved purchases of tangible assets, not securities, as confirmed by 45+ regulators and the economic reality that Go X lost money while owners profited.

Most fundamentally, this lawsuit represents egregious forum shopping by a plaintiff who continues to profit from the very program she challenges. She has suffered no injury, lost no money, and continues earning revenue from her scooters. Her decision to sue in a forum with no connection to any party or event, combined with her failure to properly serve defendants, demonstrates bad faith that warrants dismissal with prejudice.

For all the foregoing reasons, Defendant Alexander Debelov respectfully requests that the Court:

1. **Quash service of process** for failure to comply with Rule 4;
2. **Dismiss the Complaint for lack of personal jurisdiction**;
3. **Dismiss the Complaint for improper venue**;
4. **Dismiss the Complaint with prejudice for failure to state a claim**;
5. **Grant such other relief as the Court deems just and proper**.

Dated: 08/04/2025

Respectfully submitted,

Alexander Debelov

**DECLARATION OF ALEXANDER DEBELOV IN SUPPORT OF MOTION TO QUASH SERVICE AND DISMISS THE COMPLAINT**

I, Alexander Debelov, hereby declare and state as follows:

**I. PERSONAL BACKGROUND AND RESIDENCY**

1. I maintain residences in both Florida and California. I conduct substantial business operations from Florida, where my principal business activities, professional network, and primary business operations are based.

2. I rent property in San Francisco, California, where I spend time throughout the year. In 2021, I spent fewer than three weeks total at this property. In 2022 and 2023, my time there varied but remained limited.

3. I do not conduct any business related to the Scooter Ownership Platform from the San Francisco property. I maintain no office there for such business and hold no meetings there related to the matters at issue in this case.

4. While I maintain a California driver's license and voter registration for historical reasons, these do not reflect my actual residency or business activities. I am in the process of updating these documents to reflect my Florida residency.

5. The San Francisco property is not my "dwelling" or "usual place of abode" as those terms are used in Federal Rule of Civil Procedure 4(e).

**II. GO X'S LACK OF CALIFORNIA PRESENCE**

7. Go X has absolutely no business presence in California. The Company:
   - Maintains no offices, facilities, or physical presence in California
   - Has no employees or contractors based in California
   - Has no scooters deployed or operating in California
   - Has no business partners or vendors in California
   - Has no customers in California who have used our scooter services over the last 5 years

8. **Critically, Go X has not been registered to do business in California for over five years.** The Company allowed its California registration to lapse approximately five years ago when it became clear we would have no business operations in the state.

9. **Go X has had no registered agent for service of process in California for over five years.** Our previous registered agent's appointment expired when our California registration lapsed, and we have not appointed a replacement because we have no California business activities requiring such representation.

10. All of Go X's bank accounts reflect Florida addresses.

11. Go X operates exclusively in four states: Florida, Hawaii, Louisiana, and Nevada. Our operations in these states include:

   o Over 600,000 registered riders

   o Over 1,000,000 completed rides

   o Partnerships with over 250 local businesses

   o Active scooter fleets in multiple cities

12. In each of our operating states, we maintain proper business registrations, registered agents, and comply with all local regulations. California is notably absent from this list because we have never conducted business there.

## III. PLAINTIFF'S DEFECTIVE SERVICE ATTEMPTS

13. I have never been personally served with the Complaint and Summons in this action. I did not authorize anyone to accept service on my behalf.

14. I understand Plaintiff claims to have served me by taping documents to the door of the San Francisco rental property. I was not present there when this alleged service occurred.

15. **I understand Plaintiff also attempted service on a registered agent in California. This is impossible and highlights Plaintiff's lack of diligence, as Go X has had no registered agent in California for over five years.** Any entity claiming to be our registered agent has no authority to accept service on behalf of Go X.

16. The email address "alex@goxapp.com" is a secondary business email that I rarely monitor. I have never authorized this email address for service of legal process. Plaintiff never attempted service at my actual residence in Florida or through Go X's current registered agent in Delaware.

## IV. THE SCOOTER OWNERSHIP PROGRAM

17. Go X operated an innovative scooter ownership program from 2021 to November 2023, when we voluntarily suspended sales to cooperate with regulatory reviews.

18. The program allowed individuals to purchase electric scooters that were deployed in our operating markets. Key features included:

   o Full legal ownership via bills of sale with serial numbers

   o Individual tracking of each scooter's performance

   o Owner control over pricing, scheduling, and deployment

   o Right to retrieve scooters for personal use at any time

   o No pooling of assets or revenues between owners

19. Each scooter owner's returns were based solely on their individual scooters' rental performance. This created substantial variation in returns:

   o Daily earnings ranged from $0.17 to $10.15 per scooter

   o Some owners earned over 100% annual returns

   o Others requested refunds due to market conditions

   o Returns had no correlation to Go X's profitability

20. Remarkably, between 2021 and 2023, Go X lost over $1 million operating the scooter program while paying out over $2.7 million to scooter owners. This demonstrates both the independence of owner returns from our profitability and the absence of any fraudulent intent.

## V. REGULATORY COMPLIANCE AND VALIDATION

22. Go X proactively engaged with securities regulators across the country regarding our scooter ownership program. We have been transparent and cooperative with all regulatory inquiries.

23. Over 45 state securities regulators have reviewed our program. To date:

   o Connecticut's Department of Banking issued a formal determination that our program "does not involve the sale of a security"

   o New Hampshire's Bureau of Securities confirmed our business model "does not contemplate the offer or sale of securities"

   o No state has required securities registration

   o No state has taken enforcement action

24. We obtained four independent legal opinions from experienced securities counsel, each concluding our program does not involve the sale of securities under federal or state law. These attorneys analyzed the Howey test and determined we were selling assets, not investment contracts.

25. Go X submitted a comprehensive No-Action Request to the SEC's Division of Corporation Finance, providing detailed analysis of why our program involves legitimate asset sales. We have cooperated fully with all SEC inquiries.

## VI. PERSONAL INVOLVEMENT AND LACK OF ENRICHMENT

26. I have never personally received any financial benefit from the scooter ownership program beyond my regular salary as CEO, which remained unchanged throughout the program's operation.

27. I did not receive any:
   o   Bonuses tied to scooter sales
   o   Commissions on program revenue
   o   Profit sharing from the program
   o   Stock options or grants related to program performance
   o   Any other form of compensation connected to the program

28. When certain markets underperformed due to hurricanes and other factors, Go X voluntarily processed over $7200,000 in refunds to dissatisfied owners, often taking 90% losses on returned scooters. I personally approved this refund policy to ensure no participant lost money, even though it substantially increased our losses.

## VII. NO CALIFORNIA NEXUS FOR CLAIMS

29. None of the events giving rise to Plaintiff's claims have any connection to California:
   o   The scooter program was conceived and developed in Florida
   o   All program decisions were made in Florida
   o   Program operations were managed from Florida
   o   No scooters operated in California
   o   No program revenues came from California

30. Go X operates multiple business lines, with the scooter ownership platform comprising less than 2% of our total business operations. The vast majority of this limited scooter-related business is conducted outside of California.

31. While I may occasionally respond to routine emails or phone calls when I happen to be in California, this incidental activity is minimal and not specific to California. The scooter ownership platform is primarily managed by my business partner and our employee, Khodr Salam, who handles virtually all communications with participants, including all communications with Plaintiff. These communications and operations are conducted from outside California.

32. When I am at the San Francisco property, I conduct various business activities, but none related to the matters alleged in this lawsuit. I do not perform any business activities connected to Plaintiff's claims from that location.

## VIII. PARALLEL PROCEEDINGS AND FORUM SHOPPING

32. The Securities and Exchange Commission conducted an extensive investigation of the scooter ownership program for approximately two years before filing a civil enforcement action in July 2025. We are vigorously defending against the SEC's claims, which we believe are based on an incorrect understanding of the facts and law. The California Department of Financial Protection and Innovation has also been reviewing the same program but has not filed any enforcement action.

33. Plaintiff Dina Mhmoud continues to own her scooters, maintains full access to her owner dashboard, and continues to earn revenue from her scooters as of the date of this declaration. She has suffered no injury and lost no money.

34. I believe Plaintiff's decision to file this lawsuit in California, where neither I nor Go X have any meaningful presence, while she continues to profit from the program, represents improper forum shopping designed to harass and burden defendants.

## IX. STATEMENT UNDER PENALTY OF PERJURY

35. If this Court finds it has jurisdiction (which I respectfully submit it does not), I am prepared to demonstrate that:

- o   Every representation made about the scooter program was truthful
- o   Actual returns matched or exceeded projections in many markets
- o   All risks were fully disclosed
- o   No participant lost money
- o   The program involved legitimate asset sales, not securities

36. I reiterate that I have never been properly served in this action, this Court lacks personal jurisdiction over me, and California is an improper venue for this dispute. The appropriate forums, if any, would be Florida where I reside and conduct business, or before the federal agencies already investigating these matters.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of August, 2025, at Hallandale Beach, Florida.

ALEXANDER DEBELOV

# EXHIBIT A –

# FLORIDA, HAWAII, LOUISIANA BUSINESS REGISTRATIONS

# Florida Business Tax Application

Welcome, AlexD ▾

**Certificate Details**

The *Florida Business Tax Application* you submitted online has been **APPROVED**.

**DOR Comments**

**Comments:** NONE

**Business Details**

**Business Name**
Cheetah X Inc

**Business Partner Number**
6038631

**Business Address**
120 SW 8th St, Miami, FL 33130

**Certificate/Account Numbers**

**Sales & Use Tax Certificate Number**
74-8018318509-0

**e-Services Enrollment User ID & Password**
Receive by mail or call

You will receive certificates of registration or other official notification by mail within ten days. If you registered for *Sales And Use Tax* or *Communications Services Tax* and need to make resale purchases before receipt of certificates, your suppliers may use the Department's resale certificate verification system here (https://verify-taxcerts.floridarevenue.com/) or may call 877-FL RESALE (877-357-3725 (tel:8773573725)) to obtain a transaction authorization code for your resale purchases.

**Service Center**

If you require further assistance, you may call or visit your local taxpayer service center:

> **ACCOUNT CREATION UNIT**
> ACCOUNT MANAGEMENT, MS 1-5730
> TALLAHASSEE, FL 32399-0160
> 850-617-8296 (tel:850-617-8296)

- If you did not enroll in the e-Services program to file and pay taxes electronically when you registered, you may wish to do so. Learn more about e-Services here (https://floridarevenue.com/taxes/eservices).
- A start-up kit for new business owners (http://floridarevenue.com/dor/businesses/newbusiness_startup.html) is available for you to view, download or print.

# BANK ACCOUNTS ADDRESS



| Addresses ⓘ | Primary residence | Associated accounts | ✎ Edit |
|---|---|---|---|
| | ████████████ ████ <br> HALLANDALE BEACH FL 33009-7679 | Business Adv Fundamentals - 2604 <br> Business Adv Fundamentals - 8489 | |

Add mailing address

R. Kyle Ardoin
**SECRETARY OF STATE**

01/14/2022

**State of Louisiana
Secretary of State**



COMMERCIAL DIVISION
225.925.4704

Administrative Services
225.932.5317 Fax
Corporations
225.932.5314 Fax
Uniform Commercial Code
225.932.5318 Fax

ONLINE FILING
k@goxapp.com

GO X  L.L.C.

It has been a pleasure to approve and place on file your application for certificate of authority.  The appropriate evidence is attached for your files.

Payment of the filing fee is acknowledged by this letter.

In addition to email and text notifications, business owners now have the option to enroll in our secured business filings (SBF) service. This service is available online, at no charge, by filing a notarized affidavit. Upon enrollment, an amendment cannot be made to your entity without approval using your personal identification number. This is another way to protect your business from fraud and identity theft.

Please note that as of January 1, 2018, business owners in the following parishes will be required to file all available business documents online through geauxBIZ: Ascension, Bossier, Caddo, Calcasieu, East Baton Rouge, Jefferson, Lafayette, Livingston, Orleans, Ouachita, Rapides, St. Tammany, Tangipahoa and Terrebonne.

Online filing options are available if changes are necessary to your registration or if you need to file an annual report.  Please visit our website at **GeauxBiz.com** for your future business needs.

Sincerely,

The Commercial Division
WEB

Rev 09/09



# UNITED STATES OF AMERICA
# State of Louisiana

## R. Kyle Ardoin
### SECRETARY OF STATE

*As Secretary of State, of the State of Louisiana, I do hereby Certify that*

the Application Form for Certificate of Authority of

## GO X  L.L.C.

Domiciled at HONOLULU, HAWAII,

Was filed and recorded in this Office on January 14, 2022.

Thus authorizing the limited liability company to exercise the same rights and privileges accorded similar domestic limited liability companies, subject to the provisions of R. S. Title 12, Chapter 22, Part VIII.

In testimony whereof, I have hereunto set my hand and caused the Seal of my Office to be affixed at the City of Baton Rouge on,

January 14, 2022



*Secretary of State*

WEB 44754702Q

**Certificate ID:** 11511726#4CF52

To validate this certificate, visit the following web site, go to **Business Services**, **Search for Louisiana Business Filings**, **Validate a Certificate**, then follow the instructions displayed.
**www.sos.la.gov**

Page 1 of 1 on 1/14/2022 3:33:00 PM

**R. Kyle Ardoin**
**SECRETARY OF STATE**

**State of Louisiana**
**Secretary of State**



**COMMERCIAL DIVISION**
225.925.4704

<u>Administrative Services</u>
**225.932.5317 Fax**
<u>Corporations</u>
**225.932.5314 Fax**
<u>Uniform Commercial Code</u>
**225.932.5318 Fax**

**January 14, 2022**

The attached document of GO X  L.L.C. was received and filed on January 14, 2022.

WEB 44754702Q

Rev 09/09

# APPLICATION FOR AUTHORITY

# TO TRANSACT BUSINESS IN LOUISIANA

## (R.S. 12:1345)

**This Company is For:**
BUSINESS

**Limited Liability Company Name:**
GO X L.L.C.

**Previous Company Name:**
CHEETAH X INC.

**Date of Organization:**
07/18/2018

**Period of Duration:**
PERPETUAL

**Principal office address in state or country of incorporation/organization:**
2144 AUIKI ST FRNT
HONOLULU , HI, 96819

**Principal business office address:**
433 WALKER ST
HOLY HILL, FL, 32117

**Principal business establishment in Louisiana:**
2301 JULIA ST
NEW ORLEANS, LA, 70119

**Registered office address in Louisiana:**
2301 JULIA ST
NEW ORLEANS, LA, 70119

**Mailing Address:**
433 WALKER ST
HOLY HILL, FL, 32117

**Registered agent's name and address in Louisiana:**
KHODOR SALAM
2301 JULIA ST
NEW ORLEANS, LA, 70119

**The name and municipal address (not a P.O. Box only) of the managers or members:**
KHODOR SALAM (MEMBER)
433 WALKER ST
HOLY HILL, FL, 32117

**Nature of Business to be transacted in Louisiana:**
ELECTRIC VEHICLE PROVIDER

**The filing of a false public record, with the knowledge of its falsity, is a crime, subjecting the filer to fine or imprisonment or both under R.S. 14:133.**

BY TYPING MY NAME BELOW, I HEREBY CERTIFY THAT I AM A MEMBER/MANAGER.
**ELECTRONIC SIGNATURE:** KHODOR SALAM (1/14/2022)
**TITLE**: PRESIDENT OF OPERATIONS



## Department of Commerce and Consumer Affairs

## CERTIFICATE OF GOOD STANDING

I, the undersigned Director of Commerce and Consumer Affairs of the State of Hawaii, do hereby certify that according to the records of this Department,

GO X L.L.C.

was organized under the laws of the State of Hawaii on 10/22/2021 ; that it is an existing limited liability company in good standing and is duly authorized to transact business.



IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Department of Commerce and Consumer Affairs, at Honolulu, Hawaii.

Dated:   January 14, 2022

Director of Commerce and Consumer Affairs

To check the authenticity of this certificate, please visit: http://hbe.ehawaii.gov/documents/authenticate.html
Authentication Code: 417802-COGS_PDF-265090C5

**SECRETARY OF STATE**



# Agent Affidavit and Acknowledgement of Acceptance

**Charter Number:**  44754702Q

**Charter Name:**  GO X  L.L.C.

**The agent / agents listed below accept the appointment of registered agent for and on behalf of the Charter Name above.**

| Date Responded | Agent(s) | Agent(s) Electronic Signature |
| --- | --- | --- |
| 01/14/2022 | KHODOR SALAM | KHODOR SALAM |

LINKEDIN ADDRESS



GO X OPERATIONS:



# EXHIBIT B –

# CHEETAH X INC

# CALIFORNIA BUSINESS RECORDS

# CHEETAH X INC CORPORATE RECORDS



# EXHIBIT C –

# CHEETAH X INC (GO X) SCOOTER PROGRAM DOCUMENTATION & DINA MHMOUD'S CONTINUED PARTICIPATION

Dina has access to Go X dashboard, where she can see and control how her fleet performs in real-time. She continues to earn profit from her fleet actively.





She has the option to set pricing, schedule and even request scooters to be shipped to her house.





# EXHIBIT D –

# DINA MHMOUD'S BILL OF SALE

# BILL OF SALE

**Seller**

**Name:** Cheetah X Inc (dba "Go X")

**E-mail:** we@goxapp.com

**Buyer**

Full Name: **Dina Mhmoud**
Phone Number (#): **8457642609**
Email: **dmhmoud@gmail.com**

---

**Description of property:** Go X Scooter

**Scooter Model:** Okai

**Scooter SNs #:** 4A46-9229

**Location:** Daytona Beach
**Purchase price (per scooter):** $1600.00

---

**Description of property:** Go X Scooter

**Scooter Model:** Okai

**Scooter SNs #:** 4D6A-9785

**Location:** Daytona Beach
**Purchase price (per scooter):** $1600.00

---

**Description of property:** Go X Scooter

**Scooter Model:** Okai

**Scooter SNs #:** 4830-9937

**Location:** Daytona Beach
**Purchase price (per scooter):** $1600.00

---

**Description of property:** Go X Scooter

**Scooter Model:** Okai

**Scooter SNs #:** 4F0F-94F0

**Location:** Sarasota
**Purchase price (per scooter):** $1600.00

---

**Description of property:** Go X Scooter

**Scooter Model:** Okai

**Scooter SNs #:** 4696-97C4

**Location:** Sarasota
**Purchase price (per scooter):** $1600.00

---

**Description of property:** Go X Scooter

**Scooter Model:** Okai

**Scooter SNs #:** 4B61-A706

**Location:** Honolulu
**Purchase price (per scooter):** $1600.00

**Description of property:** Go X Scooter

**Scooter Model:** Okai

**Scooter SNs #:**  445B-91B8

**Location:** Honolulu
**Purchase price (per scooter):** $1600.00

**Description of property:** Go X Scooter

**Scooter Model:** Okai

**Scooter SNs #:**  4769-B157

**Location:** Daytona Beach
**Purchase price (per scooter):** $1600.00

**Description of property:** Go X Scooter

**Scooter Model:** Okai

**Scooter SNs #:**  453E-BB93

**Location:** Daytona Beach
**Purchase price (per scooter):** $1600.00

**Description of property:** Go X Scooter

**Scooter Model:** Okai

**Scooter SNs #:**  4CDD-9EFA

**Location:** Daytona Beach
**Purchase price (per scooter):** $1600.00

The Seller hereby confirms that the information provided is true and accurate to the best of their knowledge. The Seller warrants that they are the legal owner of the electric scooter and have the right to sell it. The scooter is sold in "as is" condition, and the seller disclaims any further warranty of its condition or functionality.

The Buyer acknowledges receipt of the electric scooter as per the described condition and accepts the terms of the sale.

# EXHIBIT E –

# REGULATORY CORRESPONDENCE AND COMPLIANCE





STATE OF CONNECTICUT
**DEPARTMENT OF BANKING**
**SECURITIES AND BUSINESS INVESTMENTS DIVISION**
260 CONSTITUTION PLAZA – HARTFORD, CT 06103

July 17, 2024

Alexander Debelov, Chief Executive Officer
Cheetah X Inc,
338 Spear Street - Suite 8C
San Francisco, California  94105

Re:    Cheetah X Inc. Scooter Ownership Program – Existence of a "Security" Under
        Section 36b-3(19) of Chapter 672a of the Connecticut General Statutes, the
        Connecticut Uniform Securities Act (the "Act")

Dear Mr. Debelov:

We have received your July 17, 2024 and prior e-mailed communications requesting that our office issue an advisory interpretation on whether the sale of electric scooters by Cheetah X Inc. doing business under the brand name "Go X" would constitute the sale of securities under the Act.  For purposes of this letter, will be refer to Cheetah X Inc. as "Go X."

As I understand them, the pertinent facts are as follows.  Go X has developed a program whereby individuals can purchase electric scooters and optionally participate in a rental program. Go X proposes to sell electric scooters to individual purchasers in Connecticut at prices ranging from $1,000 to $2,000 per scooter, depending on the scooter model.  Scooter purchasers would receive full ownership rights to their scooters, including a bill of sale (not included with your correspondence) containing the scooter's serial number.  Scooter owners would have the ability to use the scooters for their own use.

Go X will offer scooter purchasers the option of participating in a rental program operated by Go X.  Rental program participants would have the ability to set availability for when their scooters could be rented; set the rental price; and choose the Connecticut markets in which the scooters can be rented.  Each scooter owner's returns would be based solely on how their individual scooters perform and not on the success of other owners or on Go X itself.  While scooter owners will receive a percentage of the revenue derived from the rental of their specific scooters, you represent that such a split would not involve Go X's profits.  You further represent that, even if Go X were operating at a loss, scooter owners would still receive rental revenue based on the performance of their individual scooters.  Go X's financial records would record the scooters as assets belonging to the individual owners rather than to Go X.  Each scooter owner's success would be independent of other owners.

Given the active involvement of scooter purchasers in the arrangement (directly purchasing scooters for their own use or to rent out), the fact that the arrangement essentially involves the sale of goods/products, the fact that purchaser funds will not be pooled, the fact that scooter purchasers will not be sharing in Go X's profits and the fact that the arrangement does not bear the traditional indicia of a security, we cannot conclude that the arrangement would involve the sale of a "security" within the meaning of Section 36b-3(19) of the Act.  Note that this position is based

exclusively on the facts presented and that any material variance in those facts may prompt a conclusion that differs from that contained herein.

Although not addressed in your correspondence, we would suggest that you also review with your legal counsel Chapter 672c of the Connecticut General Statutes, the Connecticut Business Opportunity Act which may apply to the management aspects of the arrangement.

Should you have any questions, please do not hesitate to contact the undersigned at (860) 240-8233.

Very truly yours,

JORGE L. PEREZ
BANKING COMMISSIONER


By            /s/
Cynthia Antanaitis
Assistant Director

 Gmail

Alexander Debelov <a@goxapp.com>

---

## your e-mail

---

**Brian W. Linares** <Brian.Linares@sos.nh.gov>
To: Alexander Debelov <a@goxapp.com>

Fri, Aug 16, 2024 at 6:07 AM

Hi Alex,

Thanks for your patience while I reviewed this. Based on the facts, information provided, and agreement, the business model does not contemplate the offer or sale of securities as defined by N.H. RSA 421-B:1-102. After review, I believe this is clear that securities are not involved in this model and are accordingly are not licensed or otherwise regulated by this office.

All the best,

Brian



**Brian Linares │ Senior Staff Attorney**

Bureau of Securities Regulation

New Hampshire Secretary of State

(603)271-1463

www.sos.nh.gov

  

---

**From:** Alexander Debelov <a@goxapp.com>
**Sent:** Monday, August 12, 2024 4:18 PM
**To:** Jeff Spill <Jeff.Spill@SOS.NH.GOV>
**Cc:** Brian W. Linares <Brian.Linares@SOS.NH.GOV>
**Subject:** Re: FW: your e-mail

Dear Brian,

Please let me know if you require additional information in regards to this matter.

Thank you.

Best,

Alex


[Quoted text hidden]
[Quoted text hidden]



3495 US Highway 1, Suite 16 | Princeton, New Jersey 08540

November 15, 2023

Richard Nacht, Esq.
+1 (609) 937-0974
richard@nacht.lawyer

**VIA EMAIL ONLY**

Alexander Debelov
Cheetah X Inc (dba "Go X")
1 Bluxome St Suite 303
San Francisco, California 94107

   Re: Cheetah X Investment Platform

Dear Alexander:

   This letter addresses your request for a Legal Opinion regarding your business model related to Cheetah X Inc. ("**Go X**" or "**Company**") and the investments ("**Investments**") made via the Go X Investment Platform (the "Platform").


   The subject matter herein addresses whether the investment in the purchase of certain scooters (the "Investment") is likely to be deemed a U.S.-regulated security. Our chief conclusion is that based upon our review of the provided information, applicable law, and generally accepted facts, the Investment is not likely to be considered a security transaction.

I.   **The Go X Platform[1]**

   The contents of this section summarize the described background facts of Go X, along with bona fide statements of intent and future plans represented to us by the Company (including through documents and synchronous conversations). Our opinion therefore assumes, and its validity is absolutely conditioned upon, the accuracy of this material, along with other representations made to us by the Company upon which we have expressly or implicitly relied.

   Go X purchases certain scooters from manufacturers. The purchased scooters are enhanced by Go X with the installation of an IOT device that can track the scooters' movement.

   Go X sells the enhanced scooter to Buyers ("Owners") who will then be in the business of renting scooters to third parties as a business. Go X has multiple cities in which it has contracted with a) parties to manage the rentals and repair scooters as necessary and b) local business which will station the scooters.

   Owners track the usage of the scooter rentals and receive rental income via the dashboard.

---

[1] The information provided in Section I is provided by Go X.

II.      **Legal Background**

A.  <u>US Securities Laws</u>

Section 2(a)(l) of the Securities Act of 1933 and Section 3(a)(10) of the Securities Exchange Act of 1934, provide that the definition of a "security" includes "an investment contract." An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

*SEC vs. W.J. Howey* (hereinafter, ***Howey)*** constitutes the first, highly developed analysis and therefore most authoritative set of criteria for determining what constitutes a security.  Put simply, ***Howey's*** formulation (commonly referred to as "the ***Howey Test***") requires the presence of all the following conditions for an issuance to be deemed an investment contract:

- An investment of money; and
- In a common enterprise; and
- With the expectation of profits; and
- Derived from the efforts of others.

It should be noted that these conditions (or "elements" of the ***Howey Test***) are functional; they are concerned with the substance of the actions taken, not names, labels, or other terms created by a company that may mask the functional intent.

B.  <u>SEC Guidance</u>

The regulatory language relevant to this inquiry is contained in the Securities Act of 1933 (the **"Securities Act"**) and the Securities Exchange Act of 1934 (the "**Exchange Act**"), and interpretation thereof is provided by the Securities and Exchange Commission (the "**Commission**").

Guidance on the issue related to determining whether an instrument is a security has been provided by the Commission in a Release from July 25, 2017 (the "**Report**") wherein the Commission states:

"Under Section 2(a)(1) of the Securities Act and Section 3(a) (10) of the Exchange Act, a security includes "an investment contract." See 15 U.S.C. §§ 77b-77c. An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. See <u>SEC v. Edwards</u>, 540 U.S. 389, 393 (2004); <u>SEC v. W.J. Howey Co</u>., 328 U.S. 293, 301 (1946); see also <u>United Housing Found., Inc. v. Forman</u>, 421 U.S. 837, 852-53 (1975) (The "touchstone" of an investment contract "is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others")."

The United States Supreme Court has provided plain language that can be used to assist in differentiating when an investment contract exists and when one does not. According to the Court, an investment contract exists where "(i) in such cases, the investor is "attracted solely by the prospects of a return" on his investment…" <u>United Housing</u>. On the other hand, the Court continued, "(b)y contrast, when a purchaser is motivated by a desire to use or consume the item purchased…the securities laws do not apply." <u>United Housing</u>.

2

### III. Howey Test Analysis

Unless it is clearly a commonplace class of instruments (such as shares of equity stock), determining whether an investment is a security center on applying the *Howey Test* to the particular instrument and transaction. The test is conjunctive: all four prongs must be met for the transaction to constitute an investment contract and, thus, the offer or sale of a security. This analysis focuses on using the Platform under the required conditions outlined in this opinion. All four prongs are addressed below.

A.   Investment of Money

The tender of virtually anything of value in exchange for a putative security is well- established to satisfy the "investment of money" prong of the *Howey Test.* The consideration inspects the the means of acquiring the instrument or asset, specifically whether there was an exchange of consideration and broadly construes an "investment of money" to include not only the provision of capital, assets, and cash, but also goods or services. The Platform requires an investment of money, which falls into the requirement of an exchange of consideration.

The Go X model passes the first prong of the *Howey Test.*

B.   Common Enterprise

Courts have adopted different approaches to determining whether the common enterprise prong is met, but these have coalesced around "horizontal commonality" and "vertical commonality." The 1st, 2nd, 3rd, 4th, 6th, 7th, and D.C. Circuits have adopted horizontal commonality, focusing on the relationship among investors. That is, whether there was a 'pooling of assets from multiple investors in such a manner that all share in the profits and risks of the enterprise.' Profits or losses from general market activity do not qualify (where they do not represent an actual or effective part of the issuer's promises). Specifically, some courts will look to whether there is a distribution of profits and losses on a pro-rata basis among investors under the horizontal commonality test. In contrast, others will look at whether there are shared profits and shared losses. The less stringent vertical commonality test may be fulfilled when the "fortunes of the investor are tied to the fortunes of the Company."

The Go X model does not promote a sharing of profits with Owners, and there is no expectation that any funds will be used to support the continued development of the Platform. Thus, there is no connection between the Owners and the Company in the manner required under the common enterprise element.

The Go X model fails the second prong of the *Howey Test*.

C.   With an Expectation of Profits

An "expectation of profits" under the *Howey Test* arises when a putative investor is sufficiently led to believe (possibly, but not necessarily through overt promises) that pecuniary gains will result from his or her investment.  The expenditure of the initial payment has a clearly defined purpose arising from using the Platform, which is clearly expressed by the Company as an anticipated expectation of profits in the context of an investment contract under the Securities Act.

As such, in our view, the third prong of the *Howey Test* is met and passed.

D.   From the Efforts of Others

3

The final element of *Howey* requires that the profit-making efforts of concern in the issuance be predominantly the efforts of others, or more precisely, that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."

Where an investor of money in a common enterprise expects profits from its investment, the issuer of the security or a third party - not the investor - must be the one to expend the significant or essential managerial or other efforts necessary to the success of the investment. The investor must expect that profits be derived "solely through the efforts of the Company or someone other than themselves.

Considering the model as described above, it appears the Participant performs some of the work necessary to implement the model in its chosen territory. Nevertheless, the predominant efforts are conducted by the Company and others.

Therefore, the Go X model passes the fourth prong of the *Howey Test*.

### IV.     Analysis Results and Conclusion

As previously noted, under the *Howey Test*, it is a requirement that *all four parts* of the test be met for the instrument to be considered a security. In the subject fact pattern, it is highly likely that Part One, Part 3, and Part 4 would pass the test. However, our analysis indicates it is highly unlikely that Part Two would pass. Therefore, it is highly unlikely that the transactions taking place on the Platform would be considered security transactions.

Respectfully,

**NACHT & ASSOCIATES PC**

*Richard Nacht*
Richard Nacht, Esq.

**This opinion is subject to the facts and descriptions as presented to this firm. This Opinion Letter has been drafted for Cheetah X Inc, and no other party shall rely on the contents or conclusions reached herein. This document is confidential and should not be shared with any third party unless approved by this office or compelled by law.**

Richard Nacht, Esq. has been practicing law for forty years.  His specializations include securities law, in particular, related to exemptions and related requirements contained in the U.S. Securities and Exchange Commission's rules and regulations arising from the registration requirements of the 1933 Securities Act.

*Disclaimer: The information contained herein is provided on an informed researched best-efforts opinion. There is no guarantee that any particular jurisdiction will interpret the law or regulations contained herein the same as the writer. This firm disclaims any responsibility, whether direct or indirect, which may arise from any such different interpretation by any regulatory or other governmental entity.*

4

Law Offices of
**CHOBEE EBBETS, P.A.**

cebbets@ebbetslaw.com

**Chobee Ebbets, P.A.**
Board Certified Civil Trial Attorney

November 15, 2023

Via Email Only

Khodor Salam
Cheetah X, Inc. d/b/a Go-X
President of Operations, Go-X

## LEGAL OPINION LETTER

Dear Khodor:

This letter is in response to your request for an opinion letter based upon your advising me of a pending investigation by the SEC, and the request for my review of your present "Sales Agreement," which I understand may have precipitated this investigation.

I have not had any communications with the SEC on your behalf, nor do I practice in the area of law involved in SEC investigations. However, I am experienced in the area of general contract law and in proving opinions as to the legal interpretation of contracts such as the one that was used in this matter. As further background, I am aware of your former and current business models based upon providing legal services in the State of Florida on your behalf.

As a further qualification on my ability to assist in this matter I must advise you that I am not licensed to practice law in the State of California, nor was I retained to create the contract that is at issue in this case.

### History of the Cheetah X, Inc. d/b/a "GO-X "Business Model:

Based upon my prior legal representation I am aware of the GO-X business model and how the company has successfully operated a business which essentially is a joint venture type of enterprise where you acquire electric scooters and then reach out to businesses that may wish to rent them to local customers in a relevant market.

I understand as an attorney with 47 years of experience that the SEC has been involved in investigating businesses who through a network of phone solicitation to consumers sell devices such as motorized wheelchairs in violation of SEC regulations. GO-X in my opinion has a very different business model, as the customer you work with is completely independent of any type of control by GO-X. Your customer's

---

**138 Live Oak Avenue, Daytona Beach, Florida 32114**
**(386) 253-2288 • Fax: (386) 257-1253**

Khodor Salam
November 15, 2023
Page 2

profit, if any, is completely dependent upon the customer's discretionary business decisions as to how they provide the scooters for rental in their market.

**Analysis of the "Sales Agreement"**

While I understand you have been provided legal opinions from other attorneys who have concluded that this is not an "investment contract" that is subject to the regulation of the SEC, which is based upon their review of the elements of the seminal case that controls this issue, *SEC v. W.J. Howey*. <u>While I concur in this analysis, I am approaching this opinion letter from the standpoint of the clear language of the agreement itself.</u> I understand that your agreement was not prepared by an attorney, and thus, there were terms included in the agreement that actually have no legal effect upon how the agreement works, but which unfortunately are "catchwords," which may have triggered this investigation. Again, without duplicating the work performed by other legal counsel, SEC case law conforms with general contract law, in that the "labeling" of terms within a contract does not control the legal effect of the agreement. Therefore, the terms in the agreement, that speak about the purchaser being an "investor" and/or, potentially doubling their "investment; or, the "investor is purchasing [a] GO-X scooter fleet..;" or "they will earn 55% of their initial investment capital;" or, "...if there is enough investor interest on the platform;" or, "... return of investment," does <u>not</u> create an "investment contract" because the actual business model involves the customer simply purchasing the scooters at an agreed price and then renting the scooters in a manner that is solely within their discretion and control. Whether they reach a goal of obtaining a return on the money paid for acquiring the scooters (i.e. their investment) is not an " security investment," in a legal sense.

Under universal general contract law, terms in a contracts are to be given their ordinary and common definitions and usage. An "investment" is generally understood to have multiple legal meanings. Generally, in contract law it means to put money into something so that it generates revenue. This can be a business, a home or other property, securities, stocks, bonds, or other items such as gold and silver. In this context, I am of the legal opinion that the references in the contract to the term, "investor," is intended to be used in the general context of any investment and are not intended to mean, nor do they create, a securities transaction or investment.

This opinion is based upon a review of your contract and how the agreement with the scooter purchasers actually works. In a securities transaction, there is an issue of whether the representations made by the entity to the persons seeking to "invest" in the offering are fraudulent or misleading such that they should be subject to Federal regulation.

---

Khodor Salam
November 15, 2023
Page 3

Your business records will show that the purchaser of the scooter obtains a return on their investment in purchasing the scooter(s) solely as a result of the number of rental that they achieve in their individual business. While again, I do not practice, nor hold myself to be an expert in the securities law area, my legal experience does allow me to address how the law is generally applied.

The U.S. Supreme Court decisions that address the issue of regulating security contracts stems from the longstanding involvement of state and federal government protecting consumers under what are known as "Blue Sky Laws." Thus, consumers are often mislead into making investments based upon a promise of a "fixed return" regardless of the performance of the stock or asset. This was addressed in the case of *SEC v. Edwards*, which was decided after *Howey* in 2004.

Clearly, the contract which you entered into with your purchasers did not promise any "fixed" return on their investment in the scooter, nor did it promise any specific monetary return based upon any particular sales volume. They were paid monthly on a transparent "dashboard" that showed the number of rentals and the amount paid to the business partner as set forth in the agreement.

The agreement states that a return on the purchase and rentals of the scooter (i.e. the investment) is based upon prior sales performance, and that, "if" there is enough investor interest in the platform, then GO-X will have the right to purchase the "fleet" back from the purchaser making them "whole" on their initial investment. No portion of the contract makes any promises on a specific return, but instead cautions that while a 1.5x return on the initial purchase costs could be achieved, that this was governed by various market issues that were outside the control of GO-X.

In this regard, my opinion based upon an analysis of how the platform works and the language used in the agreement, is that the contract offered to the purchaser by GO-X, does provide them with an "expectation of profit," but does not do so under any terms that are misleading or overreaching. Therefore, my understanding of the need for regulation by the SEC of true "securities contracts" stems from a legitimate government interest in protecting a consumer from fraud. My understanding of the GO-X business model or "platform" does not indicate that there is any misleading terms anywhere within the agreement. Instead, the purchaser is clearly informed that they are purchasing an "asset" in the form of a fleet of scooters that they in turn rent to consumers in what is essentially a joint venture between GO-X and the purchaser. While GO-X assists in support for these rentals as stated in the contract, the location for the sale, the method of operation of rentals , and the number of rentals in any given month is totally within the discretion and control of the purchaser.

Khodor Salam
November 15, 2023
Page 4

While, I was not involved in the formation of the agreement which was stated to be governed by California law, it is my opinion that what GO-X was attempting to do was create a joint venture with the entities who agreed to purchase and rent the scooters. Under California law, a "joint venture" is defined in the following manner:

"A joint venture has been defined as an undertaking by two or more persons, jointly to carry out a single business enterprise for profit with its existence, depending upon the intention of the parties, as shown by, and expressed agreement or by inferences from their acts and conduct." *Lasry v. Lederman, 147 Cal. App. 480, 485, 305 P.2d 663* (1957).

GO-Ex and the "Buyer" as it is called in the agreement, is a sales platform where the buyer purchasers the Scooter that has been initially purchased by Cheetah X, Inc, and then re-sold to the Buyer. The agreement then provides in a sharing of profits based upon the rentals of the asset that has been sold to the buyer, as defined by the terms of the agreement. The buyer is promised certain provisions such as the right to terminate the agreement, or seek a return of the initial investment, so that the agreement is completely bilateral. The income achieved and then shared by the parties is based upon the successful rentals of the purchaser, which is completely within its control. Therefore, in my legal opinion this agreement meets the definition of a joint venture.

It is further my opinion that each contract between GO-X and the respective buyer is a separate agreement based upon the sale and performance between GO-X and that *particular* buyer. GO-X, based upon the information that you have provided to me does not pool these contracts or resources in order to create its business model or platform. Each company is paid solely upon its own performance. Thus, it has not created a business scheme involving the pooling of investor (i.e.purchaser's) funds.

I am going into more detail about your business model as it has been explained to me or is otherwise known to me, because I believe this may be important  to whomever reviews this correspondence. As a litigation attorney, I understand that any matter is decided on a review of the specific facts attributable to the transaction being examined.

Finally, it is my understanding based upon my past dealing with your company, that your "partnering businesses," as you call them have been very satisfied with your business model both in its original format and in the new platform that is under review. I have not been advised of any complaints involving your agreement or your performance thereunder. I understand that form time to time, consumers (i.e. renters of the scooters) have complaints about their operation or location for return, etc.,  and that these are issues within the control of the rental business and not GO-X.

Khodor Salam
November 15, 2023
Page 5

**Summary of Legal Opinion:**

Based upon my understanding of the facts and an analysis of your contract or agreement, it is my legal opinion that Cheetah X, Inc. d/b/a GO-X entered into a sales agreement with its buyers that involved the sale of an asset, i.e. a defined electric scooter for an agreed price, which involved a joint venture whereby after purchase of the scooters, the purchaser would rent the scooter for an agreed and defined percentage of the rental income, and GO-X would supply defined support and promises with respect to the payment of rental income and return/cancelation policies with respect to the purposes of acquiring a defined asset/product that would then be rented and the profits from the rentals shared on a defined basis.

In my opinion, this was not a securities transaction as the term would be understood by a lawyer who practices in general contract law.

**Regarding the Subpoena from the SEC**

I have reviewed the subpoena that was served by the SEC. As indicated in my initial comments, I am outside general counsel who has provided your company with specified legal services in the past. I have never specifically dealt with the SEC, but I have dealt with subpoenas issued by other governmental agencies. In that context, it is my advice that you use your best efforts to comply with its requests. However, it would appear that given the volume of materials requested that you should through legal counsel request an extension for completing your compliance. This should be done in advance of the due date. Since the investigation is to be done in California, I would suggest that you retain counsel who would then make the request on your behalf and review the completeness of your response.

I will be happy to assist in any way that I can within the limitations of the fact that I am not licensed to practice in California and I do not specialize in this area of law.

Sincerely,

Chobee Ebbets

**Note:** This opinion letter is subject to the facts, descriptions, and limitations outlined above. This Opinion Letter has been prepared for the use of Cheetah X, Inc. and no other party should rely upon the contents or conclusions reached herein.

—BRASHEARS—
LAW GROUP

Bryan Brashears
Bryan@BrashearsLawGroup.com
7500 Rialto Blvd, Suite 250
Austin, Texas 78735

Cheetah X Inc. DBA "Go X"
Attn: Alexander Debelov
16192 Coastal Highway
Lewes, Delaware 19958

Tuesday, November 14, 2023

Dear Mr. Alexander Debelov:

Thank you for selecting the Brashears Law Group to handle your needs. I have been working with security offerings, regulations and qualifications since receiving my law license in November of 2016. The team at the Brashears Law group is dedicated to assisting clients with their legal needs and business goals relating to these matters. Per your request, I've researched whether Cheetah X Inc., a Delaware corporation doing business as "Go X" (hereafter "Go X") is issuing an unregistered security. In this letter I have provided an analysis that applies laws and court decisions to Go X's business operations.

**Question Presented: Whether Go X is issuing an unregistered security.**

BACKGROUND

Go X is in the business of providing the marketplace with electric vehicles and scooters (collectively, "Scooters"). Part of Go X's business model is as follows: (i) purchase Scooters from manufacturers, including Okai, Blue Duck and 9 Kings; (ii) modify the Scooter to be affixed with specific hardware and software, including an Internet of Things ("IOT") device Scooter, which is used to track the Scooters' location, movement, maintenance status and availability to be rented out; and (iii) resell the Scooter to Go X's customer.

After the Scooter is purchased, the customer directs Go X to a location where the Scooter is to be deployed. Go X assists the customer with coordinating with the local businesses and venders to ensure the Scooter has sufficient maintenance, repairs and attention; storage; and providing the customer with access to Go X's network of Scooter service providers. Go X's

Page 1 of 5



customer will also receive a payment for the Scooter purchased, based on the rental performance of the customer's Scooter.

SECURITIES LAWS AND COURT DECISIONS

First, it is illegal to offer or sell securities in the United States, unless the offer or sale of the security is made pursuant to an effective registration statement filed with the United States Securities and Exchange Commission (SEC) or is otherwise exempt under the federal securities laws.[1] The Securities Act of 1933 (Securities Act) provides a thorough definition for the term "security," which includes a wide variety assets, offerings and investment vehicles, such as "investment contract." [2]

Currently, "investment contract" is the best fit for analyzing most abstract investment like arrangements under the Securities Act. In 1946 the court's decision in *SEC v. W.J. Howey Co.* provided additional guidance on how to interpret investment contracts in the context as a security offering under the Securities Act. In this court's decision, the definition of investment contract was broad enough to include any "contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." [3] Since the ruling in 1946, later courts have broken down the Howey decision into a four-prong test, aptly named the Howey Test, to determine if the definition of the term investment contract is met. The Howey Tests includes (i) an analysis to determine the existence of an investment of money; (ii) an analysis to determine the existence of a common enterprise; (iii) an analysis to determine the existence of there is an expatiation of profits; and (iv) an analysis to determine whether expectation of profits is solely from the efforts of others. If all prongs of the Howey Test are satisfied, then the contract, transaction, scheme, or arrangement passes the Howey Test, and the sale or offering concerns a security. However, if any one of the four prongs is not present, the arrangement fails the Howey Test, and there is no security, and the Securities Act would not apply.

---

[1] Securities Act, Section 5, 15 U.S.C. § 77e(a), (c); 77d
[2] Securities Act, Section 2(a)(1), 15 U.S.C. § 77b(a)(1)
[3] SEC v. W.J. Howey Co., 328 U.S. 298-99 (1946)



THE HOWEY TEST APPLIED TO GO X

1. *Investment of Money.*

The Howey Test clearly identifies "money" to satisfy first-prong for the Howey Test. Moreover, courts have held that an investment of labor [4] or a donation [5] can satisfy this prong.

Here, Go X is selling scooters and providing ancillary services relating to marketing and maintenance to the scooters for their customers. While the customer is providing Go X with money, the customer's remittance of this payment is akin to a traditional purchase of a good or service. Thus, Go X's operations fail the Investment of Money prong of the Howey Test, as the customer is not providing Go X money for investment purposes.

2. *Common Enterprise.*

The analysis concerning the Common Enterprise prong of the Howey Test is split between the courts. A majority of courts apply what is known as the "horizontal commonality test," [6] where a common enterprise exists where multiple investors pool their assets together and share in the profits and risks of the enterprise. In contrast, a minority of courts apply the "vertical commonality test", which is further divided into two variations: (i) a narrow vertical commonality where a common enterprise exists where the fortunes of the investors are bound up with the <u>actual fortunes</u> of the promoter of issuer of the security;[7] or (ii) a broad vertical commonality variation, where a common enterprise exists where the fortunes of the investors are bound up with the <u>mere efforts</u> of the promoter or issuer. [8] (<u>emphasis added</u>).

Of the available interpretations to evaluate the Common Enterprise prong, neither apply to Go X. First, there is no horizontal community test because customers do not pool their assets or capital to share in the risks of Go X's enterprise. In regard to the vertical commonality test, there is no commonality bound to Go X's actual fortunes. While the performance of the customer's scooter is affected by the mere efforts of Go X, the customers are not pooled together to share in

---

[4] SEC v. Glenn W. Turner Enters., 474 F.2d 476, 482 (1973)
[5] Tcherepnin v. Knight, 389 U.S. 322, 383 (1967)
[6] SEC v. SG Ltd., 265 F.3d 42, 49-50 (1st Cir. 201)
[7] Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994)
[8] SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 479 (5th Cir. 1974

Page 3 of 5



the risks of Go X. Thus, Go X's operations fail the Common Enterprise prong of the Howey Test, as there is no common enterprise.

### 3. *Expectation of Profits*.

The Expectation of Profits prong of the Howey Test requires that the purchaser expected capital appreciation resulting from the development of the initial investment or expected participation in earnings resulting from the use of investor funds. [9] Courts have further ruled that such an expectation can exist when purchasers receive a "discount below the current price." [10] However, the courts have determined that there is no expectation of profit when the purchaser is motivated primarily by the desire to use or consume the item purchased. [11] The court in *United Housing Foundation v. Forman* made a ruling that helps determine how much expectation of profit is permissible before the purchase satisfies the Expectation of Profits prong. This case concerned the purchaser of shares in cooperative housing. Presumably, a profit motive is present in this purchase. Still, a motive for profit is insufficient to satisfy this prong. The court reasoned that the purchaser would not have completed the transaction if they expected to lose money or break even on the resale of the purchase. Moreover, even if profit was necessary to motivate a purchase, it would be insufficient to satisfy this prong of the Howey Test. The purchaser's expectation of profit must predominate the expectation of using the item purchased.

Go X provides its customers with an opportunity to purchase a Scooter that has the potential to generate a return on the customers' purchase. Here, the customer's motive to generate a profit is the predominate cause for the customer to purchase a Scooter from Go X. Thus, Go X's operations pass the Expectation of Profits prong of the Howey Test, as the customer's motivation to generate a provide is the predominate force to complete the purchase.

### 4. *From the Efforts of Others*.

The From the Efforts of Others prong the Howey Test explores "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." [12]

---

[9] United Hous. Found. v. Forman, 421 U.S. 837, 854-55 (1975)
[10] SEC v. R.G. Reynolds Enters., 952 F.2d 1125, 1135 (9th Cir. 1991)
[11] See Forman, 421 U.S. at 858
[12] SEC v. Glenn W. Turner Enters., 474 F.2d 476, 482 (9th Cir. 1973)

Page 4 of 5



Go X is in the business of providing the marketplace with Scooters to be used commercial to make a profit. However, Go X's business model involves collaborative effort and input from their customers. Specifically, the customer determines the location of where the purchased Scooter is deployed, which is a significant decision in regard to the marketability of the Scooter's economic deployment and success. While Go X assists customers with sourcing maintenance, repair, and storage for the Scooter, these services are generally administrative, non-substantive, and would have little effect on the economic performance of the Scooter if decided by Go X or the customer. Thus, Go X's operations fail the From the Efforts of Others prong of the Howey Test, as the customer decides the significant and essential decisions.

CONCLUSION

Go X has created an innovative business model, which provides its customers with a unique opportunity to purchase an asset that has the potential to generate a profit. While Go X's operations satisfies the Expectation of Profits prong of the Howey Test, all other prongs relating to (i) an *Investment of Money*; (ii) in a *Common Enterprise*; and (iii) being *From the Efforts of Others* are unsatisfied. Thus, because not all four-prongs are satisfied, Go X is not issuing an unregistered security.

OREN LITWIN LLC
712 H STREET NE SUITE 1780
WASHINGTON, DC 20002
Member of D.C. Bar.

## MEMORANDUM

To:     Cheetah X Inc dba Go X—16192 Coastal Highway, Lewes, Delaware 19958

From:  Oren Litwin

Date:   14 November 2023

Re:     Securities-law analysis of the Go X scooter agreement

You wanted an analysis of whether Go X providing scooters for purchase and managing their rental to customers would constitute a security. It would not, because investors' money is not being pooled with each other; instead, investors are purchasing discrete scooters to rent out.

This memo relies entirely on information provided by Go X. It is valid only to the degree that the relevant information in this Factual Background is accurate.

The legal analysis to follow is informed by my experience with *Howey*-Test analysis. In my professional experience as a securities attorney, I have analyzed assets including crypto tokens, music royalties, carbon credits, coupons for food and drink, and more. I am confident that the legal analysis properly takes into account the relevant body of caselaw and regulatory guidance.

### I.    FACTUAL BACKGROUND

Go X manages electric scooters that are rented out to tourists in popular destinations. While Go X owns some of the scooters, it also sells scooters to investors, agreeing to provide maintenance of the scooters and to manage their rental via its software platform in exchange for 30% of the scooter's rental revenue. Go X does not allow for purchases of fractional scooters; the minimum purchase price for a single scooter is $2,000. Go X retains a repurchase option on the scooters that it can exercise once a given scooter has paid out 50% of its purchase price to the owner.

Each scooter has a serial number and owners can track how often their scooters are rented out. Owners can take possession of their scooters if they wish.

### II.    LEGAL BACKGROUND

The Securities Act has a long list of asset types that are considered a security.[1] In *S.E.C. v. C.M. Joiner Leasing Corp.*,[2] the Supreme Court held that aside from commonly standardized assets such

---

[1] *See* 15 U.S.C. § 77b(a)(1).
[2] 320 U.S. 344 (1943).

W: orenlitwinlaw.com
C: (562) 572-4890
M: oren@orenlitwinlaw.com

OREN LITWIN LLC
712 H STREET NE SUITE 1780
WASHINGTON, DC 20002
Member of D.C. Bar.

as stocks and bonds, the substance of a transaction would control whether a particular interest is a security, and not the particular label, form, or name attached to such interest.[3]

*Howey Test*

Typically, if the SEC wants to argue that an unfamiliar asset is a security, it will say that the asset is an "investment contract," a type of security that has become a catch-all category over the years. According to the "*Howey* test," a non-enumerated asset is considered an investment contract if the buyer:

(1) "invests his money[,]"
(2) "in a common enterprise,"
(3) regarding which he has been "led to expect profits,"
(4) which will accrue "solely[4] from the efforts of the promoter or a third party."[5]

If any of these elements is not met, the asset is not considered a security. For the present purposes we can assume that the first, third, and fourth elements are met. That leaves us with the second element, the "common enterprise."

*Common Enterprise*

As a general matter, if monies contributed by investors are combined in a common pool, there is the strong potential of a "common enterprise." If investors buy discrete assets that are separate from each other, it would not constitute a common enterprise.

Courts have variously applied two tests of whether there is a common enterprise. *Horizontal commonality* is "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits."[6] This requires that the profitability of one investor's asset must have a "direct impact on the profitability" of the other investors' assets.[7]

---

[3] *Id.* at 352-53. One might be tempted to call a rental-split agreement a "certificate of interest or participation in any profit-sharing agreement," an enumerated security type in the Securities Act. *See* 15 U.S.C. § 77b(a)(1). However, courts have essentially combined this security with "investment contract," discussed below, and apply the same analysis to both. *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 102 (7th Cir. 1977).

[4] Or, as applied today, "substantially."

[5] *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298–299 (1946). The Court subsequently stated that the economic realities test "embodies the essential attributes that run through all of the Court's decisions defining a security." *United Housing Foundation. Inc. v. Forman*, 421 U.S. 837, 852 (1975).

[6] *Revak v. S.E.C. Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

[7] *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274, 276 (7th Cir. 1972).

W: orenlitwinlaw.com
C: (562) 572-4890
M: oren@orenlitwinlaw.com

OREN LITWIN LLC
712 H STREET NE SUITE 1780
WASHINGTON, DC 20002
Member of D.C. Bar.

*Vertical commonality*, which is recognized by some court circuits but rejected by others, requires that the fortunes of investors be connected not to each other, but to the fortunes (or in some views, the mere efforts)[8] of the promoter.[9]

### III.    ANALYSIS

Because investors purchase discrete identifiable scooters and their investment is not pooled with the investments of others, Go X's program does not satisfy the "common enterprise" prong of the *Howey* tests and is therefore not a security.

In *Howey*, the plots of land sold to investors were not separately fenced and were generally managed as part of a larger whole; the oranges from the entire operation were pooled, and the nominal landowner-investors were not allowed to enter their land or to harvest the fruit themselves.[10] Moreover, the plots of land were often too small for individual development to be economically feasible.[11]

In contrast, the scooters made available by Go X are rented out individually, via a software platform designed for efficient commercial operation. Investors purchase whole scooters and do not share ownership with other investors; they can retrieve their scooters if they wish, and can track the performance of their scooters individually. The investment return of one scooter does not affect that of another; and investors can earn profits even if Go X itself is unprofitable.

### IV.    CONCLUSION

Because the Go X program does not satisfy the second prong of the *Howey* Test and is therefore not a security, Go X is not required to register its offering with the SEC or to rely on an available exemption.

---

[8] The court in *Revak* considered this view ("broad vertical commonality") and held that it does not satisfy the common enterprise prong, because otherwise it would essentially absorb the "efforts of others" prong. *See Revak*, 18 F.3d at 88.

[9] *See id.* at 87-88.

[10] *Howey*, 328 U.S. at 295-296.

[11] *Id.* at 300.

W: orenlitwinlaw.com
C: (562) 572-4890
M: oren@orenlitwinlaw.com

| Organization | Date | Description | Relevant Division / Personnel | Name | Topics Covered | Status |
|---|---|---|---|---|---|---|
| Commodity Futures Trading Commission | 6/25/24 | E-mail Correspondence | General Counsel - CFTC | Rob Schwartz | E-mail correspondence inquiring about Go X's scooter platform | |
| Commodity Futures Trading Commission | 6/26/24 | Phone Call | Christopher Goodman | Christopher Goodman | Had a call with Christopher Goodman of CFTC, who confirmed that they will be able to issue Go X No Action and what we are selling is not a security. Agreed to loop in staff from his team to help with obtaining appropriate documents to make that determination official. | **Verbally confirmed that Go X Platform is NOT a Security** |
| Commodity Futures Trading Commission | 6/27/24 | Video Conference | Assistant Chief Counsel, Division of Market Oversight + Economist | Bennett, Lauren; Gouloubandi, Sanam; Goodman, Chris | Had a video call with 3x people from CFTC discussing Go X's Scooter Ownership Platform | |
| Commodity Futures Trading Commission | 06/27-07/17 | E-mail Correspondence | Assistant Chief Counsel, Division of Market Oversight + Economist | Bennett, Lauren; Gouloubandi, Sanam; Goodman, Chris | Sent emails regarding Go X's platform | |
| Commodity Futures Trading Commission | 7/22/24 | Video Conference Call | Assistant Chief Counsel, Division of Market Oversight + Economist | Bennett, Lauren; Gouloubandi, Sanam; Goodman, Chris | Had a follow-up video call with 3x people from CFTC about obtaining No Action letter from them | |
| Commodity Futures Trading Commission | 07/17-07/26 | E-mail Correspondence | Assistant Chief Counsel, Division of Market Oversight + Economist | Bennett, Lauren; Gouloubandi, Sanam; Goodman, Chris | Sent follow-up e-mails regarding Go X's platform | |
| Commodity Futures Trading Commission | 8/12/24 | Video Conference | Senior Counsel and Policy Advisor | Nora Flood, Chris Goodman, Sanam Gouloubandi, | Had a video conference call with Nora Flood, Senior Counsel and Policy Advisor of CFTC. This was done to help us obtain necessary documentation from CFTC to confirm that Go X's platform is not a security, and to help us submit the appropriate papework. | **In the Process - Awaiting an Official No Action Letter (refer to Go X No Action Letter Submitted to CFTC)** |
| Connecticut - Securities and Business Investments Division | 7/12/24 | E-mail Correspondence | Assistant Director Securities and Business Investments Division | Cynthia Antanaitis; Olesky, William; Cannata, Salvatore | Sent an e-mail inquiry regarding Go X' Scooter Ownership Platform | |
| Connecticut - Securities and Business Investments Division | 7/16/24 | Video Conference | Assistant Director Securities and Business Investments Division | Cynthia Antanaitis; Olesky, William; Cannata, Salvatore | Had a conference where we discussed Go X's Scooter Ownership Platform | |
| Connecticut - Securities and Business Investments Division | 7/16-07/17 | E-mail Correspondence | Assistant Director Securities and Business Investments Division | Cynthia Antanaitis; Olesky, William; Cannata, Salvatore | CT granted No Action Letter to Go X | **Official No Action Letter Received** |
| New Hampshire - Bureau of Securities | 7/11/2024 - 08/12/2024 | E-mail Correspondence + Phone Call | Deputy Director, Bureau of Securities | Jeffrey Spill, Brian W. Linares | E-mail correspondence regarding Go X's scooter platform | |
| New Hampshire - Bureau of Securities | 8/16/24 | E-mail Correspondence | Deputy Director, Bureau of Securities | Jeffrey Spill, Brian W. Linares | New Hampshire granted Go X No Action response | **Official No Action Response Received** |

| Organization | Date | Description | Relevant Division / Personnel | Name | Topics Covered | Status |
|---|---|---|---|---|---|---|
| Financial Industry Regulatory Authority (FINRA) | 6/25/24 | Phone Call / E-mail Correspondence | Adam is Associate General Counsel | Adam Arkel | Agreed that the proposed platform is not a securities transactions, but FINRA will not be able to issue a No Action Letter here, but looking into what kind of official statement they can make | Reviewing Platform |
| North American Securities Administrators Association (NASAA) | 6/25/24 | Phone Call | General Line | | Agreed that the proposed platform is not a securities transaction, but couldn't issue any official statement | |
| Securities Industry and Financial Markets Association (SIFMA) | 6/25/24 | Phone Call + Email | General Counsel | | Agreed that Go X platform is not a securities transactions, but advised Go X to get in touch with SEC's Division of Corporation Finance to help with No Action Letter | |
| Federal Trade Commission (FTC) | 6/25/24 | Phone Call | Deputy General Counsel | Bill Cohen | Spoke to Bill Cohen (Deputy GC). He referred me to 2 People -> Patricia McDurmont & Joseph Baker. Said that this doesn't seem like a securities transaction, but asked to work with Patricia + Joseph to get an official statement | Reviewing Platform + Possibly Official Statement |
| Utah Division of Securities | 06/25-06/28/24 | Phone call + E-mail Correspondence | Corporate Finance Specialist | Trista Lopez | Circulated my inquiry internally | |
| Utah Division of Securities | 6/28/24 | Phone call | Chief of Licensing and Corporation Finance or Chief of Compliance | Bryan Cowley and/or Ken Barton | Had an extensive 60 min phone call, where one of the division heads after reviewing Go X website and offering confirmed that the Go X platform is NOT A SECURITY. Instructed me to forward all information to Charles (Chip) Lyons who would grant an official No Action Letter | **Verbally confirmed that Go X is NOT a Security** |
| Utah Division of Securities | 06/28/24-08/12/24 | Phone call + E-mail Correspondence | Corporate Finance Specialist | Trista Lopez | Requested more information from Go X and requested that we pay a fee to receive an official No Action Letter. Go X is awaiting the official No Action Letter. | **Awaiting No Action Letter** |
| NC Department of the Secretary of State - Securities Division | 6/25/24 | Email Correspondence + Mail + Check Payment | Director of Securities in NC | Perry Boseman | Spoke with Perry Boseman. He said $150 non-refundable fee to be processed. They are in the process of issuing a No Action Letter, but can take up to 5 weeks response time | **Awaiting No Action Letter** |
| Minnesota Department of Commerce - Securities | 6/25/24 | Phone Call + Email Correspondence | Franchise & Securities Registration Director | Geoff Spray | Instructed me to send an official request | |
| Minnesota Department of Commerce - Securities | 6/25 - 07/18 | Email Correspondence + Mail + Check Payment | Franchise & Securities Registration Director | Geoff Spray | Sent them a No Action Request + Check. Legal Team is Reviewing | |
| Minnesota Department of Commerce - Securities | 07/18-08/13 | Email Correspondence + Phone Call | Franchise & Securities Registration Director | Geoff Spray | Confirmed that legal should be issuing No Action Letter any day now | **Awaiting No Action Letter** |
| New York State Department of Financial Services (DFS) | 7/11/24 | Phone Call | General Counsel - The Department of Financial Services | Office of the General Counsel | Discussed Go X platform extensively on 35 min call, where the person determined that Go X is selling an asset (not security) | **Verbally confirmed that Go X is NOT a Security** |

| Organization | Date | Description | Relevant Division / Personnel | Name | Topics Covered | Status |
|---|---|---|---|---|---|---|
| Department of the Secretary of State Securities Division California | 6/25/24 | Phone Call | Securities Division | General | They agreed that this is most likely not a securities transaction. However, in order to obtain a No Action Letter, they have advised us to get in touch with SEC's Division of Corporation Finance | |
| Missouri Secretary of State - Securities Division | 07/11-08/12 | Phone Call + Email Correspondence + Mail + Check Payment | Securities Division | General | They are currently reviewing. They sent 30 questions that Go X has submitted responses to. They will be issuing No Action letter any day now. | |
| Missouri Secretary of State - Securities Division | 8/13/24 | E-mail Correspondence | Securities Division | General | Send a big list of questions that Go X is responding to, will 90% issue No Action Letter based on the facts of the platform | **Awaiting No Action Letter** |
| Virginia - Division of Securities and Retail Franchising | 7/17/24 | E-mail Correspondence | Division of Securities and Retail Franchising | Stephen A. Arrighi | Sent us a response and provided instructions on how Go X would go about obtaining a No Action Letter from Virginia. | **Submitting Virginia Specific No Action Letter** |
| Colorado Division of Securities | 7/12/24 | Phone call + E-mail Correspondence | Division of Securities | Jason Gross | Explained that we would need to work with private counsel to make a determination, said that issues raised in No Action letter addressed in Go X's letter to Colorado did not raise specific issues that would warrant them issuing a No Action Letter to us | |
| Ohio Securities Division | 6/25/24 | Phone call + E-mail Correspondence | Securities Division | General | They don't provide opinion letters or no action letters | |
| Alabama Securities Commission | 6/25/24 | Phone call + E-mail Correspondence | Securities Commission | Tina Tell | Have confirmed that this is most likely not a security, but reviewing our request in detail | |
| Alabama Securities Commission | 7/25/24 | Phone call + E-mail Correspondence | Securities Commission | Tina Tell | Followed up with them on our request. Submitted No Action Letter | |
| Alabama Securities Commission | 8/9/24 | Email Correspondence | Securities Commission | Beau Brown | Followed up with 18 questions, Go X is replying and 90% will receive a No Action Letter | **Awaiting No Action Letter** |
| Alaska Division of Banking & Securities | 7/10/24 | Email Correspondence | Division of Banking & Securities | George Humm; Ann Suvlich | Reached out with an inquiry. Was told someone will respond | |
| Alaska Division of Banking & Securities | 7/11/24 | Email Correspondence | Division of Banking & Securities | George Humm; Ann Suvlich | Received a correspondence, submitted a No Action Letter for further review | |
| Alaska Division of Banking & Securities | 7/25/24 | Email Correspondence | Division of Banking & Securities | George Humm; Ann Suvlich | Followed up to see if additional information is needed, 80% chance that No Action Letter will be granted | **Awaiting No Action Letter** |
| Arkansas Securities Department | 7/10/24 | Email Correspondence | Securities Division | General | Reached with an inquiry to obtain a No Action letter | **Awaiting Response** |
| Delaware - Securities Division (now Investor Protection) | 7/16/24 | Email Correspondence | Securities Division | General | Reached with an inquiry to obtain a No Action letter | **Awaiting Response** |
| Florida Office of Financial Regulation (OFR) | 7/12/24 | Phone call + E-mail Correspondence | General Counsel / Office of Financial Regulation | Anthony Cammarata | Submitting Petition for Declaratory Statement. Based on conversation, there's 90% likelihood it will be approved based on FL's regulations | **Awaiting Petition for Declaratory Statement** |

| Organization | Date | Description | Relevant Division / Personnel | Name | Topics Covered | Status |
|---|---|---|---|---|---|---|
| Georgia Securities Division | 7/16/24 | Email Correspondence | Securities Division | General | Reached with an inquiry to obtain a No Action letter | **Awaiting Response** |
| Illinois Securities Division | 6/25/24 | Phone Call | Securities Division | General | Agreed that Go X platform is not a securities transaction, but their division does not issue No Action Letter. Advised us to get in touch with SEC's Division of Corporation Finance to help with No Action Letter. | |
| North Dakota Securities Department | 7/12/24 | Phone Call + Email | Securities Division | General | Agreed that Go X platform is not a securities transaction, asked that we send a more detailed No Action Letter | |
| North Dakota Securities Department | 8/12/24 | E-mail Correspondence | Securities Division | General | Asked to pay a fee, so that they can issue an official No Action Letter in this regard | **Awaiting No Action Letter** |
| Louisiana Office of Financial Institutions | 7/11/24 | Phone Call | Deputy Chief Examiner \| Securities | Doug Buras, CPA | Verbally cofirmed that Go X platform is not a securities offering. Asked that we send him an official request via e-mail | **Verbally confirmed that Go X is NOT a Security** |
| Louisiana Office of Financial Institutions | 8/12/24 | E-mail Correspondence | Deputy Chief Examiner \| Securities | Doug Buras, CPA | Submitted a request for Go X No Action Letter. 90%+ No Action Letter will be granted | **Awaiting No Action Letter** |
| Wyoming Securities Division | 7/18/24 | E-mail Correspondence | Compliance Division Director | Kelly Janes | Submitted a No Action Letter Request. 90%+ No Action Letter will be granted | **Awaiting No Action Letter** |
| Idaho Department of Finance | 6/25/24 | Phone Call + Email | Supervising Securities Analyst | Nancy Ax | Verbally confirmed that No Action letter should be granted based on what the platform is. Was told to pay a fee + mail a No Action letter request | |
| Idaho Department of Finance | 07/12/24--08/12/24 | Phone Call + Email | Supervising Securities Analyst | Nancy Ax | Paid a fee via check,mailed out No Action letter request, was told there's 90% chance that No Action letter will be issued | **Awaiting No Action Letter** |
| Indiana Securities Division | 7/17/24 | Phone Call + Email | Registrations Attorney / Securities Division | Ronald Allman | Verbally said that they should be able to grant No Action letter here without much issues. Instructed to have us pay a fee and submit via portal | |
| Indiana Securities Division | 7/18/24 | Email | Registrations Attorney / Securities Division | Ronald Allman | Paid a fee, submitted via portal Go X request for No Action letter from Indiana. 95% chance will be granted | **Awaiting No Action Letter** |
| Iowa Securities Division | 7/12/24 | Email Correspondence | Assistant Bureau Chief | Jill Anderson | Reached out with an inquiry about obtaining No Action Letter | |
| Iowa Securities Division | 7/12/24 | Email Correspondence | Assistant Bureau Chief | Jill Anderson | Submitted No Action Letter request + answered follow-up questions. 90% chance No Action Letter will be granted | **Awaiting No Action Letter** |
| Kansas Securities Division | 7/13/24 | Email Correspondence | Securities Division | General | Reached with an inquiry to obtain a No Action letter | **Awaiting Response** |

| Organization | Date | Description | Relevant Division / Personnel | Name | Topics Covered | Status |
|---|---|---|---|---|---|---|
| Kentucky Securities Division | 7/12/24 | Email Correspondence | Assistant Director, Division of Securities | Chad K. Harlan | Reached out with inquiry to obtain a No Action Letter | |
| Kentucky Securities Division | 7/13/24 | Email Correspondence | Assistant Director, Division of Securities | Chad K. Harlan | Was instructed to pay $250 and mail the No Action Letter | |
| Kentucky Securities Division | 7/18/24 | Mail + Check + Email | Assistant Director, Division of Securities | Chad K. Harlan | Paid $250 fee, mailed out the letter. The department received and began their review | |
| Kentucky Securities Division | 7/26/2024 - 8/12/2024 | Mail + Check + Email | Assistant Director, Division of Securities | Chad K. Harlan | Department confirmed that they are doing their review and soon will be granting a No Action Letter | **Awaiting No Action Letter** |
| Maryland Securities Division | 7/16/24 | Email Correspondence | Securities Division | General | Reached with an inquiry to obtain a No Action letter | **Awaiting Response** |
| Massachusetts Securities Division | 7/23/24 | Email + Phone | Securities Division | Peter Cassidy | Proactively reached out to Go X to see if we will need a No Action letter from MA | |
| Massachusetts Securities Division | 7/24/2024- 08/12/24 | Email + Phone | Associate Director, Chief of Corporate Finance, Corporate Finance Attorney | Peter Cassidy, Trevor.Mears@sec.state.ma.us | Submitted No Action Letter, responded to follow-up questions. There's 95% chance that No Action will be granted | **Awaiting No Action Letter** |
| Mississippi Securities Division | 07/15/24- 08/13/24 | Email | Licensing Auditor, Securities | Lacy Hancock | Submitted No Action Letter request and corresponded on e-mail. In the end, they said that MS can't make a determination and recommended to rely on private counsel's guidance. | **Recommended to Rely on Private Counsel's Determination** |
| Montana Securities Division | 7/15/24 | Email + Phone | Legal Counsel, Commissioner of Securities and Insurance | CHRIS MCCONNELL | Submitted $100 fee payment and No Action Letter alongside other pertinent documents | |
| Montana Securities Division | 8/13/24 | Email | Legal Counsel, Commissioner of Securities and Insurance | CHRIS MCCONNELL | In the process of responding to follow-up questions, and will highly likely receive a No Action letter from them (90%+) | **Awaiting No Action Letter** |
| Nebraska Securities Division | 07/30-08/12 | Email | Legal Counsel, Nebraska Department of Banking & Finance | Mike Cameron | Received No Action request, Legal Opinions letters and currently reviewing. Most likely will issue a No Action Letter | **Awaiting No Action Letter** |
| New Jersey Bureau of Securities | 07/30-8/16 | Email | Director, Regulatory Unit, New Jersey Bureau of Securities | Rachel Glasgow | Received all docs from us and currently reviewing. Highly likely to issue a No Action Letter | **Awaiting No Action Letter** |
| New Mexico Securities Division | 07/12-08/15 | 3x-4x Phone Calls + Email | Compliance Manager, Securities Division | Nona S. Lane | Spoke multiple times on the phone. They received our No Action letter. Currently reviewing, but should be issuing No Action Letter any day now | **Awaiting No Action Letter** |
| Oklahoma Department of Securities | 07/11-08/12 | Phone Calls + Email + Mail + Check | General Counsel | Gerri Kavanaugh | Sent them $250 check along with the letter to Oklahoma. Awaiting response, highly likely to issue No Action Letter | **Awaiting No Action Letter** |
| Oregon Division of Securities | 7/16/24 | Email | Securities Division | General | Reached with an inquiry to obtain a No Action letter | **Awaiting Response** |

| Organization | Date | Description | Relevant Division / Personnel | Name | Topics Covered | Status |
|---|---|---|---|---|---|---|
| Pennsylvania Division of Securities | 7/16/24 | Email | Securities Division | General | Reached with an inquiry to obtain a No Action letter | **Awaiting Response** |
| Rhode Island Securities Division | 07/12-08/13 | Email Correspondence | Associate Director/Chief Securities Examiner | Don DeFedele | Submitted Go X No Action Request letter alongside other information. The division is reviewing and highy likely to issue a No Action Letter | **Awaiting No Action Letter** |
| South Carolina Securities Division | 07/15-08/12 | Email + Phone + Check + Mail | Senior Assistant Attorney General | J. Louis Coté III | Sent them a check for $150, sent them No Action Request letter. Currently reviewing, but highly likely to issue a No Action letter | **Awaiting No Action Letter** |
| Washington Securities Division | 07/15-07/16 | Phone Call + Email + Check + Mail | Registration & Regulatory Affairs Unit, Securities Division | Jill M. Vallely | Sent them a check, No Action letter request, connected on the phone. | |
| Washington Securities Division | 7/26/24 | Email | Registration & Regulatory Affairs Unit, Securities Division | Jill M. Vallely | Sent us follow-up questions that we are responding to. Highly likely to issue a No Action Letter. | **Awaiting No Action Letter** |
| West Virginia Securities Division | 07/11-07/29 | Phone Call + Email + Check + Mail | Senior Regulatory Counsel, Securities Commission | Michael Nusbaum | Sent them $120 check, alongside No Action Letter request. Verbally confirmed that this will not be a security. | |
| West Virginia Securities Division | 07/11-07/29 | Email | Senior Regulatory Counsel, Securities Commission | Michael Nusbaum | Sent us follow-up questions that we are responding to. 95%+ chance that they will issue a No Action Letter. | **Awaiting No Action Letter** |
| Wisconsin Securities Division | 7/16/24 | Email | Securities Division | General | Reached with an inquiry to obtain a No Action letter | **Awaiting Response** |
| Hawaii | 07/11-08/12 | 4x Phone Calls + Emails | Securities Compliance Supervisor | J. David Sonoda | Had multiple calls, sent No Action Letter Request, the matter is being reviewed with high likelihood of No Action Letter being granted | **Awaiting No Action Letter** |

**DECLARATION OF ALEXANDER DEBELOV IN SUPPORT OF MOTION TO DISMISS**

---

**PROOF OF SERVICE**

[Standard proof of service]

---

**PROPOSED ORDER**

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA**

**DINA ADEL MHMOUD,**
*Plaintiff,*

v.

**CHEETAH X INC. and ALEXANDER DEBELOV,**
*Defendants.*

**Case No. 25-cv-00198-DMR**

**[PROPOSED] ORDER GRANTING DEFENDANT ALEXANDER DEBELOV'S MOTION TO QUASH SERVICE AND DISMISS THE COMPLAINT**

Having considered Defendant Alexander Debelov's Motion to Quash Service and Dismiss the Complaint, the opposition (if any), the reply (if any), the arguments of counsel, and the complete record in this matter,

IT IS HEREBY ORDERED that:

1. Defendant's Motion to Quash Service of Process is GRANTED. Service of process on Defendant Alexander Debelov is hereby QUASHED as defective and invalid.
2. Defendant's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED. This Court lacks personal jurisdiction over Defendant Alexander Debelov.

3.  Defendant's Motion to Dismiss for Improper Venue is GRANTED. Venue is not proper in the Northern District of California.

4.  Defendant's Motion to Dismiss for Failure to State a Claim is GRANTED. The Complaint fails to state a claim upon which relief can be granted.

5.  This action is DISMISSED WITH PREJUDICE as to Defendant Alexander Debelov.

6.  Each party shall bear its own costs and attorneys' fees.

7.  The Clerk shall enter judgment accordingly and close this file as to Defendant Alexander Debelov.

IT IS SO ORDERED.

Dated: _____ _____ Hon. _____

United States District Judge